David Zirkle on behalf of Lizandro Rincon. Good morning, your honors. Thank you for leaving this one on. This is an easy case to sweep under the rug. It really is. It's a huge gang indictment, 101 defendants. I think 100 defendants, well actually 101 defendants have now been convicted. Mr. Rincon was only convicted of the possession of ammunition charge, but this closing argument was egregious. Now, I know it's plain error. I got that. I understand that counsel should have objected, but I really think that this is worth reversing for a couple of reasons. The first being, if your honors were so inclined, you could go onto the YouTube and watch the government's presentation of this case on the History Channel's Gangland series. This case is specifically featured. I think it's like episode 7 of the 2009 series. Prosecutor Peter Hernandez, now Judge Peter Hernandez, gave an extensive interview about this case, and he said basically the same things that he said in closing argument about how this is a war in the community, about how they're on the side are right, and I think it's a big deal that they called Mr. Rincon a savage. I understand that not everybody means a racial component when they use the term savage. What immediately gives me pause, obviously, is that the jury, far from being swayed by emotion and sort of casting logic and reason to the side, they acquitted, or was it acquittal or mistrial, on all of the most serious charges and ended up convicting them only of the most minor of the charges, right? This is trial number two, and there was a first jury who theoretically didn't have this argument who also didn't convict Mr. Rincon of the same evidence. What does the first jury have to do with it? They didn't hear this closing argument. So what does that have to do with anything? I understood the import of Your Honor's question to be, look, there was a lot of evidence. The jury was obviously able to sift through it, but I think it undercuts that argument when to say how good the government's evidence is on these other counts when a first jury. I didn't say the evidence was necessarily good. I mean, if you got acquitted, it obviously wasn't. I'm just saying that it – yes, the remarks were improper. I think the government concedes that. Well, they concede part of it, and it's a very smart concession on their part. They say, hey, look, the community values, obviously that's out of bounds, and they say nothing about the savage remark. That's improper as well. Okay, granted. It's a different kind of improper, though, right? I mean, it's not just improper in the same way the community – you can have all kinds of improper arguments. Arturo Sanchez, what we said was, but for this improper comment from the prosecutor there, we have serious doubts about whether this jury would have convicted the defendant. And I guess I don't – I mean, tell me why I'm wrong, but I don't have those doubts here with respect to this one charge. This count, this one count, the ammunition count. Fair enough. I represented Arturo Sanchez. I know his case. It's an interesting question whose case was worse. Mr. Rincon brought a defense on the bullets. I'm not saying it's the best defense. I'd probably be looking at the negotiating table if I had this evidence to deal with. But it wasn't impossible, and I think there are a couple of important facts. The first is Judge Carter denied acceptance of responsibility. Judge Carter said, look, you put out a theory about how you didn't have the power and intention to control. That was a denial of an element. And the second thing was the government destroyed the bullets, and so they went with the recycled bullets theory. And this does happen. I mean, I haven't had enough gun cases yet since I practiced in San Diego and not Los Angeles to know how often this defense is successful. But I do know that reloading bullets happens. Like, it's expensive to buy new bullets, and that some folks who have aptitude are able to reload bullets. And that's one of the possibilities that Mr. Rincon put out. Obviously, his argument was a blunderbuss argument, obviously. But it is true that the government destroyed the bullets without explanation. But just, I mean, you're not really advancing the ball in my mind, at least, because connect the improper comments to why the jury would have been swayed to convict this guy of that charge based on what they heard in the closing argument. It's because they have to convict him of something. Like, the prosecutor is telling him, look, this guy is a horrible menace to the community, and the jury honestly does not believe that the rapes occurred. They honestly don't believe that because there are 80,000 phone calls and Mr. Rincon's on one, they just didn't think the government had its case on the Vicar and the, you know, related counts. The possession of ammunition, though, that was a throw-in. That's an easy thing. It wasn't, in closing argument, Ms. Farentino who did it. What was the evidence that he actually possessed it? Well, okay, so there's this pet shop, which Mr. Rincon owns, and there is a pursuit. The L.A. police are pursuing a suspect. They go to the pet shop. They search. There's a shed behind the pet shop. In the shed, there's this ammunition, and there's some dispute about what the statements are. There are statements from Mr. Rincon saying, yeah, I knew they were there, and counsel said. Well, I think he said it was mine. It's his pet shop, yeah. He says the ammunition is mine. I mean, I knew it was there, but because I was a convicted felon, I knew I couldn't do anything with it. I mean, that was his explanation. That was related by the police. The power and intention to control argument, and, you know, it seems to me the question is, is that a viable theory under this court's case law? If it's not, then Judge Carter would have given him an acceptance of responsibility because he would have admitted to all of the elements of the offense. So, and Judge Carter is an incredibly careful judge, and I think he would have given him acceptance had Mr. Rincon really admitted to everything. But he denied it. He said, look, how do we know that these aren't interstate? How do we know that the interstate element's made? And when it comes down to this kind of jury question, I put this through my briefs. It's the argument that's developed for United States v. Kaiser, which is, look, I mean, if a defendant doesn't contest the element, if the defendant says, look, you know, this is the evidence and I'm not saying anything, then you just say, was it overwhelming? Like the $5 million in meter, that's overwhelming. But if you contest it, if you say something like, well, I'm not sure I wanted to control it, I think that you get a jury finding on that. And I think that it's important in a case like this. Like, I really do think that the word savage is a racial term. Let me ask you this. Your time is running out. Did you want to address the sentencing issue or are you going to submit on the or stand on the papers for the time being? The sentencing issue seems pretty – it's the second concession of error, right? The government's going for the residual clause, but it seems to me that the residual clause argument is dispensed with by Flores v. Holder, which specifically says that California Battery, as interpreted through CPC 69, cannot qualify because it lacks for the intent. So if Your Honors have questions on that, I can address them. I just have one question, actually, about whether that sentencing issue is essentially  I mean, he's about to be released. Does anything turn on – I mean, there's no way he's going to get resentenced, even if we agreed with you on this, to get less time. Does anything turn on it, our resolution on this issue now? Yeah, I mean, I guess Judge Carter could decide to shorten the term of supervised release, although it would be entirely up to him. There wouldn't be anything mandatory, so. Well, if he said it wasn't a – He's a very fair-minded individual. If it didn't qualify as a violent – if it didn't qualify under the ACC. Correct. The base offense level would have been lower. He gets – you know, for a future, if he gets popped again. Oh, that's true. Yes. There is that. So I will reserve – Or a supervised release, a violation of supervised release. Theoretically, a benefit could come his way. But Mr. Rinconi is out of custody. Oh, he's already out? He is. Oh, okay. Thank you, Your Honors. You can save the balance of your time for rebuttal. Yes. Thanks. Oh. Good morning, Your Honors. May it please the Court, Assistant United States Attorney Kevin Rosenberg. With a couple of factual matters, I think counsel's reference to gangland episodes and media coverage of this trial is, first of all, outside the scope of the record and really irrelevant. There's absolutely no evidence that anything like that was before the jury because it wasn't. The jury had – in fact, through the voir dire process, there was extensive questioning of the jury with regard to media coverage of this significant case. So whatever Mr. Hernandez, Judge Hernandez, did in connection with that is just simply irrelevant. And secondly, a factual matter that's very important is the ammunition charge that the defendant was convicted of was not charged in the first indictment. He was not charged with that at the first trial. So this is not a situation where the government's just out to get him on something. I mean, the evidence developed after the first trial with respect to that charge, and we superseded the indictment and added it in. It's clear here, Your Honors, that the jury did not feel compelled to just convict the defendant. If they were going to do that, given this horrific evidence that they had to sit through from these two young women about what happened to them at the hands of this defendant and his co-conspirators, it would seem that those would be the sorts of charges that they would be likely to convict him of. The defendants were charged with horrible crimes. They were found not guilty of those crimes. The defendant also was charged with RICO, RICO conspiracy, a conspiracy to commit murder, and the jury did not reach verdicts on those charges. And therefore, I think Your Honor's point is exactly right. What's very significant about this case that distinguishes it in a major way from Sanchez is the fact that the jury did not find the defendant guilty of all of these other charges. In Sanchez, there was just the one charge, the importation charge, and really the argument there was speaking to community, the community's need to deal with social ramifications of verdicts, and that's not really what was happening here. So that reason alone, I think, would be reason why this court should decline to reverse the defendant's conviction. There are several other reasons, I think, as Your Honor took note of. The evidence was strong. The defendant confessed, and he set forth this theory that he didn't have the power and intention to really control the ammunition. And frankly, under the case law, I don't think Judge Carter even had to give that instruction. I think under the Johnson case, he wasn't required to, but he did. The defendant had his opportunity to raise that defense with the jury. They didn't buy it. They rejected it. He had his chance. And I think for those reasons and all the other reasons that the government has set forth in its brief, the court should decline to reverse his conviction. With respect to the second issue, the sentencing issue, I think one of the key things the court needs to take note of is that the main case the defendant is citing deals with the 16B definition of a crime of violence, does not deal with the Armed Career Criminal Act definition of a crime of violence, which is found in Sentencing Guideline 4B1.2A2. That catch-all is much broader than the one that the court dealt with in the case that the defendant is citing, the 16B language. The Supreme Court has said that it's more broad. Six other circuits have said that it's more broad. There is a case from the circuit, admittedly, where the government believes in dicta. This court alluded to it being more narrow, but I think when the Supreme Court speaks on the issue, that certainly should trump. Here, what's also different is we're talking about a battery in a prison setting. The California cases that talk about battery and the potential use of de minimis force are not in a prison context, and I think that's a key distinction. Here, when you're talking about prisoners committing a battery on a non-prisoner, the risk of violence, the risk of the potential effect is enormous, and the California cases that the government has cited in its brief, talking about the kind of violent acts that have taken place against correctional officers and staff, bear that out. The catch-all under 4B1.2 is concerned about the effect, not the force, not the actions of the defendant per se. It's the effect. And here, it is clear that this kind of conduct is the potential risk, I should say, is for violence. Well, I guess I'm not sure I understand the distinction between the two, is predicated on the serious potential risk of physical injury to another. The other catch-all is more focused on the use of physical force, but how is the physical injury going to come about if there isn't this physical force involved? It just seems to me the sets of conduct that the two residual clauses are dealing with are going to overlap almost entirely, aren't they? I don't think so, Your Honor. I think the focus is different, and I think that's what makes it a key distinction. A lot of the cases that talk about the 16B language are driving into the influence, for example, where somebody maybe doesn't have to have any intent to do anything, and the courts have sort of rejected the notion that that's an intentional use of force rising to the level of being a crime of violence. Where we're not concerned about the defendant's mindset, where we're just concerned about the likelihood of what their conduct is going to cause, I think it is different. I mean, there are ways to commit the offense that the defendant suffered as a prior in ways that may not harm somebody, but the case law makes it clear we don't have to deal with the possibilities, the remote possibilities. We're talking about the sort of likely way that this could take place, and I think in those terms, clearly what this defendant did under this statute would and should apply. We're not talking about inherently probabilistic concepts as the Supreme Court. Well, you're looking at risk. Correct, Your Honor. Right. Exactly. After Sykes, I think you're looking at risk. That's right. That's right. And so I think for those reasons, it's different. I don't think the defendant's, the case that he cites, does control at all. Unless the Court has any additional questions, the Governor would submit and ask the Court to affirm. Okay. Thank you, Your Honor. You have a minute for rebuttal. Thanks, Your Honor. I won't even need it. I think you just conceded the error. By saying that Judge Carter gave an instruction, you were making the implicit finding that there was evidence in the record. That's why you give an instruction where there's evidence that can support the finding that is precisely the same analysis that motivated the Sanchez Court, because Mr. Sanchez ran a duress defense. And the whole point is, if you've made the showing to get the instruction, then the question for harmless error is, could the jury make a finding? You've already answered that question. It's now been conceded. Thank you. Okay. Thank you very much. We appreciate your arguments, counsel, and the matter is submitted. And safe travels back to San Diego, Mr. Legman.
judges: Conlon, Paez, Watford